# ESSO STANDARD OIL CO. *v.* EVANS, COMMIS-
# SIONER OF FINANCE AND TAXATION, ET AL.

NO. 330.

Argued March 10, 1953.—Decided May 4, 1953.

*William Waller* argued the cause and filed a brief for appellant in No. 330.

*Oscar H. Davis* argued the cause for the United States, appellant in No. 378. With him on the brief were *Solicitor General Cummings, Assistant Attorney General Holland, Ellis N. Slack, Lee A. Jackson* and *Berryman Green. Robert L. Stern,* then Acting Solicitor General, was on the Statement as to Jurisdiction.

*K. Harlan Dodson, Jr.* argued the causes and filed briefs for appellees.

MR. JUSTICE REED delivered the opinion of the Court.

These are appeals from the Supreme Court of Tennessee, affirming a Chancery Court judgment for some $196,000 in favor of the State Commissioner of Finance and Taxation, against Esso Standard Oil Co., the party of record in No. 330. Ultimately liable, the United States intervened in that litigation and brought a separate appeal here, No. 378. It contended that the state tax involved is barred by principles of sovereign immunity. This is a test case. We are told that if the tax is sustained, a liability for upwards of $4,000,000 will result.

The facts are these. During World War II the Government was actively engaged in the production and procurement of high octane aviation fuel. All such gasoline produced was purchased before it left the refinery and, by formal passage of title, became immediately the property of the Defense Supplies Corporation, a corporation wholly owned by the Reconstruction Finance Corporation, 6 Fed. Reg. 2972, as amended 6 Fed. Reg. 3363, and specifically exempt from state storage and use taxes, 55 Stat. 248. Release from storage by the producing companies occurred only on notification by the Petroleum Administration for War, in accordance with allocation of specific lots of fuel to various official consumers, including

the Services and the Allies. The Air Force, in particular, then arranged for transportation of its various allotments—sometimes by government carrier—from the refineries to the nearest consuming point.

We are concerned with certain lots of Air Force fuel produced in the South at various plants and shipped through Memphis, Tennessee. It appears that in 1943 a shortage of storage facilities developed in the area, forcing resort to privately owned tanks. Appellant Esso and the Lion Oil Company were able to provide such service through tanks at various points near Memphis. As a result, the Government entered into extensive contracts with Esso which in turn rented the Lion tanks, providing that the Company would "render services . . . in receiving, storing, handling and loading Government-owned fuel." The Company's service charge ranged from 18/100 of a cent to 6 3/10 cents per gallon. The United States agreed to assume liability for all state taxes. Pursuant thereto, allotments of gasoline were moved by barge from refineries to these private tanks, stored there pending need, and later reshipped by truck to consuming airfields on order of the Air Force. The operations continued from 1943 through 1946 under several contracts of similar import.

August 2, 1949, the State, after investigation, demanded that Esso pay taxes in connection with these operations under the Tennessee gasoline tax, 2 Williams Tenn. Code §§ 1126–1147. This statute, in material part, provided:

> "Every distributor when engaged in such business in this state, shall pay to the state comptroller, through commissioner of finance and taxation, for the exclusive use of the state, a special privilege tax, in addition to all other taxes, for engaging in and carrying on such business in this state, in an amount equal to six cents for each gallon of gasoline, and six

cents for each gallon of distillate refined, manufactured, produced, or compounded by such distributor and sold, stored or distributed by him in this state, or shipped, transported or imported by such distributor into, and distributed, stored or sold by him within this state, during such year; . . . ." § 1127.

And § 1126 defines distribution as

"every person who engages in the business in the state of refining, manufacturing, producing, or compounding gasoline or distillate, and selling or storing the same in this state; and also every person who engages in the business in this state of transporting, importing, or causing to be imported, gasoline or distillate into this state, and distributing, storing, or making original sales of the same in this state, for any purpose whatsoever."

Esso paid the required tax for the privilege of storing gasoline measured by the amount stored during the month of January 1944—the statute of limitations having run in regard to 1943 operations—and sued to recover. The Government intervened in the trial court and entered its plea, echoed by Esso, that the tax was barred by the constitutional doctrine of intergovernmental immunity; that to construe the Tennessee statute as applicable to storage of gasoline owned by the United States makes it repugnant to the Constitution and void. Both the Chancery Court and the Court of Appeals rejected the claimed immunity and held the statute valid as applied. 194 Tenn. 377, 250 S. W. 2d 659. We noted our probable jurisdiction on appeal. 28 U. S. C. § 1257 (2).

The appellants take a firm stand on *United States* v. *Allegheny County,* 322 U. S. 174, which they contend is an analogous case that compels reversal of this decision. They say, in effect, that the tax here is no less "on" the

property of the Federal Government than it was in that case, and in support of this claimed similarity they point to the following factors: that the statute grew out of the State's effort to tax sales to the final consumer, that the tax is paid but once, and this by the first producer or importer, and that refunds when the fuel is subsequently exported are provided. Thus the "true character" of the tax, as one "on the property of the United States," it is claimed, is precisely the same as that in *Allegheny County*.

*Allegheny County,* however, was quite different. The United States had leased certain machinery to the Mesta Machine Company. In imposing the state ad valorem property tax, Pennsylvania included in the Mesta assessment both the privately owned land and buildings, and the government machinery. *Id.,* at 179–180, 186. So the value of the federal property was, in part, the measure of the tax. We held the substance of this procedure was "to lay an ad valorem general property tax on property owned by the United States," *id.,* at 185, and therefore invalid. Our holding was not "dependent upon the ultimate resting place of the economic burden of the tax." *Id.,* at 189.

This tax was imposed because Esso stored gasoline. It is not, as the *Allegheny County* tax was, based on the worth of the government property. Instead, the amount collected is graduated in accordance with the exercise of Esso's privilege to engage in such operations; so it is not "on" the federal property as was Pennsylvania's. Federal ownership of the fuel will not immunize such a private contractor from the tax on storage. It may generally, as it did here, burden the United States financially. But since *James* v. *Dravo Contracting Co.,* 302 U. S. 134, 151, this has been no fatal flaw. We must look further, and find either a stated immunity created by Congress in

the exercise of a constitutional power,[1] or one arising by implication from our constitutional system of dual government.[2]

Neither condition applies to the kind of governmental operations here involved. There is no claim of a stated immunity. And we find none implied. The United States, today, is engaged in vast and complicated operations in business fields, and important purchasing, financial, and contract transactions with private enterprise. The Constitution does not extend sovereign exemption from state taxation to corporations or individuals, contracting with the United States, merely because their activities are useful to the Government. We hold, therefore, that sovereign immunity does not prohibit this tax.

Appellants press a further point, that the Tennessee courts have discriminated against the Federal Government by the result in this case. They point to the fact that heretofore, specifically in *Tennessee Oil Co.* v. *McCanless*, 178 Tenn. 683, 157 S. W. 2d 267, a claim of immunity by a public body was sustained where the public body had leased the tanks from the private dealer. Apparently, appellants feel that the distinction between that case and this is so fine as to require similar results from any fair-minded court. We do not agree. Had the United States similarly rented the tanks from Esso, and thus stood firmly in its shoes as the organization exercising the privilege of storage, it would have fallen within the *McCanless* precedent. It did not do so, but instead paid Esso to receive, store, handle and load the fuel. The

---

[1] *Pittman* v. *Home Owners' Loan Corporation,* 308 U. S. 21; *Carson* v. *Roane-Anderson Co.,* 342 U. S. 232; *Dameron* v. *Brodhead,* 345 U. S. 322.

[2] *Mayo* v. *United States,* 319 U. S. 441, 447; *United States* v. *Allegheny County, supra.*

different results in the two cases thus accord with our conception of the operation of the Tennessee statute as a privilege tax.

*Affirmed.*

THE CHIEF JUSTICE, MR. JUSTICE BLACK and MR. JUSTICE JACKSON dissent.

MR. JUSTICE FRANKFURTER, not having heard the argument, took no part in the consideration or decision of this case.